# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

PAUL GRIMM,

      **Plaintiff,**

vs.                                                                                                                      No. CIV 02-0065 LH/LCS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

      **Defendant.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

      **THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse and Remand (Doc. 6), filed July 23, 2002. The Commissioner of Social Security issued a final decision denying Plaintiff's applications for disability insurance benefits and supplemental security income. The United States Magistrate Judge, having considered the Motion, briefs, administrative record, and applicable law, finds that this Motion is well-taken and recommends that it be **GRANTED**.

## PROPOSED FINDINGS

      1.     Plaintiff, now sixty years old, filed his applications for disability insurance benefits and supplemental security income on November 13, 1995, alleging disability commencing on October 25, 1995, due to a heart condition, hypertension, and being easily upset. (R. at 47-53; 64.) Plaintiff has a high school education, and past relevant work as a limousine driver and video store clerk. (R. at 27; 42; and 44.)

      2.     Plaintiff's applications for disability insurance benefits and supplemental security income were denied at the initial level on January 22, 1996, (R. at 54-63), and at the reconsideration level on March 13, 1996. (R. at 72-73.) Plaintiff appealed the denial of his applications by filing a

Request for Hearing by Administrative Law Judge (ALJ) on May 16, 1996. (R. at 80-81.) The ALJ held a hearing on July 9, 1998, at which Plaintiff appeared and was represented by counsel. (R. at 21.)

3. The ALJ issued his decision on December 1, 1998, (R. at 13-15), analyzing Plaintiff's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan,* 987 F. 2d 1482, 1487 (10th Cir. 1993). At the first step of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the filing of his application. (R. at 13.) At the second step, the ALJ determined that Plaintiff had severe impairments consisting of chronic uncontrolled hypertension and a cardiac condition. (*Id.*) Although the ALJ did not mention a psychological disorder at step two, the ALJ found that Plaintiff had no severe underlying psychological disorder. (R. at 14.) At the third step of the sequential analysis, the ALJ found that the severity of Plaintiff's impairments or combination of impairments had not met or equaled any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599. (R. at 13.) The ALJ then found that Plaintiff had the residual functional capacity for light work. (R. at 14.) In light of this RFC, the ALJ determined that Plaintiff was able to perform his past relevant work of video store clerk. (R. at 15.) Thus, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (*Id.*)

4. Plaintiff filed a request for review of the ALJ's decision, (R. at 9), and submitted additional evidence to the Appeals Council. (R. at 236-292.) On December 19, 2001, the Appeals Council, after considering the additional evidence, denied the request for review. (R. at 5-6.) Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. On January 18, 2002, Plaintiff filed this action, seeking judicial review of the Commissioner's final

decision pursuant to 42 U.S.C. §405(g).

**<u>Standard of Review</u>**

5. The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *See Hamilton v. Sec'y of Health and Human Servs,* 961 F. 2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Sec'y of Health and Human Svcs.*, 985 F. 2d 1045, 1047 (10th Cir. 1993)(*quoting Broadbent v. Harris*, 698 F. 2d 407, 414 (10th Cir. 1983) (*citation omitted*)). A decision of an ALJ is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record. *See Gossett v. Bowen*, 862 F. 2d 802, 805 (10th Cir. 1988).

6. In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *See Thompson v. Sullivan*, 987 F. 2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. § 423(d)(1)(A)). At the first four levels of the sequential evaluation process, the claimant must show that he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *See id.*

3

**Administrative Record**

7.  On October 17, 1995, Dr. Julio Lamella, M.D. referred Plaintiff to Dr. Jon W. Brunswick M.D. for evaluation of severe refractory hypertension. (R. at 123.) Dr. Brunswick diagnosed severe refractory hypertension and possible sleep apnea, with a twenty year history of hypertension, hypercholesterolemia, and a family history of hypertension and ischemic heart disease. (R. at 124.) Dr. Brunswick recommended that Plaintiff undergo a series of medical tests. (*Id.*)

8.  An echocardiogram taken on October 26, 1995 revealed left ventricle asymmetric septal hypertrophy on all wall segments and hypertrophy of the myocardium with no evidence of left ventricular outflow tract obstruction. (R. at 116.) Systolic function was normal, but there was mild mitral regurgitation. (*Id.*) Chest x-rays were normal. (R. at 119.) A renal ultrasound was normal except for left renal calculus. (R. at 120.) Renal scan and renogram were normal. (R. at 121.) A March 3, 1995 renal scan and renogram had also been normal. (R. at 136.) On October 30, 1995, Dr. Brunswick recommended that Plaintiff undergo hospitalization and be placed on telemetry with calcium channel blockers added to his beta blocker to lower his pulse rate and, if he developed significant sinus bradycardia, implantation of a pacemaker. (R. at 140.) Plaintiff declined this course of treatment. (*Id.*)

9.  On February 2, 1996, Paul D. DeRenzi, M.D. performed a cardiovascular evaluation. (R. at 149.) Physical examination revealed severe arterial hypertension and no evidence of congestive heart failure. (R. at 150.) A resting EKG showed normal sinus rhythm at 60 beats per minute with a left axis deviation and voltage criteria for left ventricular hypertrophy. (*Id.*) Dr. DeRenzi found severe arterial systemic hypertension and evidence of non-obstructive hypertrophic cardiomyopathy, and observed that Plaintiff was essentially asymptomatic from cardiovascular standpoint. (*Id.*) Dr.

DeRenzi remarked that the need to bring Plaintiff's blood pressure under better control was complicated by his hypertrophic myopathy, and stated that Plaintiff's hypertrophic cardiomyopathy put Plaintiff "at some elevated risk for the occurrence of malignant arrhythmias." (R. at 150.) Dr. DeRenzi recommended further evaluation of Plaintiff heart rhythm through twenty-four hour monitoring. (*Id.*)

10. On February 15, 1996, Dr. DeRenzi stated that the monitoring revealed normal sinus rhythm with sinus bradycardia and heart rate range from 55 to 86 beats per minute. (R. at 165.) There were rare ventricular and super ventricular ectopic beats without sustained arrhythmias or pauses. (*Id.*) Plaintiff's blood pressure was 190/120, but physical examination was otherwise normal. (*Id.*) The results of an echocardiogram taken on February 15, 1996 were similar to the results obtained in October 1995. (*Id.*) Dr. DeRenzi prescribed Norvasc[1] in an effort to decrease Plaintiff's blood pressure. (R. at 166.) On April 23, 1996, Plaintiff reported to Dr. DeRenzi that he was feeling generally well, except for periods of fatigue during the day. (R. at 162.) His blood pressure was much better controlled after addition of Norvasc on his prior visit. (*Id.*)

11. In June 1997 Plaintiff began receiving care at La Familia Medical Center in Santa Fe, New Mexico.[2] (R. at 214; 217.) On September 5, 1997, Plaintiff visited the Health Centers of

---

[1] Norvasc is a calcium channel blocker indicated for the treatment of hypertension and angina. PHYSICIAN'S DESK REFERENCE 2358-59 (54th ed. 2000).

[2] Prior to this date, Plaintiff had lived and received care in New Jersey.

Northern New Mexico and reported that he was taking Cardura,[3] Tenormin,[4] Norvasc, and Prinivil[5] (R. at 178.) All medications were continued. (*Id*.) On October 27, 1997, Plaintiff requested refills of his medications from the Health Centers of Northern New Mexico. (R. at 176.) On July 2, 1997, Plaintiff reported to Gerzain Chavez, M.D. that he had converted to Buddhism and that meditation had already reduced his anxiety. (R. at 220.) Dr. Chavez instructed him on additional breathing techniques to relieve anxiety and prescribed a trial period of Zoloft.[6] (*Id*.)

12. In an undated statement, Plaintiff wrote that he experienced extreme fatigue in the morning and after lunch and that he needed to lay down for a half an hour. (R. at 221.) Plaintiff reported that at these times he felt as if needles were being pushed into his chest, his heart felt heavy and would skip a beat. (*Id*.) Plaintiff also reported shortness of breath, loss of breathing rhythm while lying down, and light-headedness and dizziness with talking more than a few minutes in person or on the phone. (*Id*.) Plaintiff stated that sometimes he saw spots in front of his eyes, and had lost his appetite. (*Id*.) Plaintiff stated that he had been diagnosed with depression, but refused medication from his cardiologist because he "does not trust psychotropic drugs." (R. at 221-222.) Plaintiff also lamented that he recently learned that he had to take antibiotics for gum disease and that he was sure his heart had been damaged by "germs." (R. at 222.) Plaintiff also reported that when he experienced

---

[3]Cardura is indicated for the treatment of urinary outflow obstruction and hypertension. PHYSICIAN'S DESK REFERENCE 2325-26 (54th ed. 2000).

[4]Tenormin is indicated in the management of hypertension. PHYSICIAN'S DESK REFERENCE 572 (54th ed. 2000).

[5] Prinivil is indicated for the treatment of hypertension, heart failure, and myocardial infarction. PHYSICIAN'S DESK REFERENCE 1866-67 (54th ed. 2000).

[6] Zoloft is indicated for the treatment of depression, obsessive compulsive disorder, and panic disorder. PHYSICIAN'S DESK REFERENCE 2399-2400 (54th ed. 2000).

"exceptional anxiety or stress like getting a ticket or waiting in a slow line at the super market" his physical reaction would "override" his medications. (R. at 222.) Plaintiff concluded that he just wanted to be in "tranquil situations that are not a threat to [his] life." (*Id.*)

13.     At the July 9, 1998 hearing, Plaintiff was represented by James A. Burke, Esq.[7] (R. at 21.) Plaintiff testified that he lived alone, was not working, and had no income. (R. at 26.) Plaintiff stated that he had sold his car and his watch and was living off the proceeds. (*Id.*) Plaintiff testified that he had sold his car about a year and a half before the hearing. (R. at 32.) Plaintiff was able to drive. (R. at 29.) Plaintiff attempted to work in telephone sales in 1997, but only lasted two days. (R. at 27-28.) Just before that, Plaintiff tried to work at New Vistas Social Agency, but his position was phased out. (R. at 28.) Before he moved to New Mexico, Plaintiff owned his own business of driving people to the airports in Northern New Jersey. (*Id.*)

14.     Plaintiff testified that he was unable to work because he over-reacted to any stressful situation, causing his blood pressure to rise, he had an enlarged heart and congenital heart problems. (R. at 29.) In addition, Plaintiff "read in the paper" that his medications caused depression and fatigue. (R. at 30.) Plaintiff had been receiving medical care at the Veterans Administration (VA) in Albuquerque since January 1998, and saw his doctors about every two weeks. (R. at 31.) Plaintiff lived and received mail in Santa Fe, but had temporarily relocated to Albuquerque to be closer to the VA. (R. at 32.) Plaintiff testified that he had no friends or family in the area and did not go to church or attend any sort of meetings. (R. at 33.) Plaintiff watched TV, went to the movies, went out to eat, and read the newspaper. (R. at 33-34.)

---

[7] Plaintiff has been represented by Michael D. Armstrong, Esq. since December 29, 1998. (R. at 236-238.)

15. Plaintiff was able to do his own laundry, shopping, bathe, dress and feed himself. (R. at 35; 36.) Plaintiff testified that he had arthritis in his knees and that was one of the reasons why he did not go to church. (R. at 37.) He was able to climb stairs on a limited basis, he was right handed and did not mention any limitations with his hands. (*Id.*) Plaintiff testified that he could sit for thirty minutes and could stand for ten minutes. (R. at 38.) Plaintiff was able to walk four blocks, but started wheezing after one block. (R. ay 38-39.) Plaintiff did not know how much he could lift. (R. at 39.) Plaintiff had not smoked in twenty years and did not have a drinking problem. (*Id.*) Plaintiff testified that he was waiting for the VA to coordinate a physical program. (R. at 36.) He stated that he underwent a stress test at Mi Familia, but his blood pressure was 220/140 and they would not allow him to continue and made him sit down because he would have "stroked out." (R. at 36.) Plaintiff's doctors had not placed him under any restrictions. (R. at 40.)

16. Plaintiff was taking Trazodone[8] for his sleep and to help with his depression. (R. at 40.) Plaintiff tried to sleep in the daytime, but he would get very drowsy because he was unable to sleep at night. (R. at 41.) He believed this was a side effect of his medication and was one of the reasons why he no longer wanted to drive. (*Id.*) Plaintiff described his depression as a "lack of optimism." (R. at 42.) Plaintiff's work attempt was unsuccessful because he was very tense and was wasting his employer's time. (*Id.*) Plaintiff quit working as an airport limousine driver because the stress on the roads raised his blood pressure and could have caused a heart attack or stroke. (R. at 42-43.) Plaintiff felt stressed and jumpy on a daily basis. (R. at 43.) Plaintiff testified that he would be unable to work in a video store because of the "confrontational" nature of the business. (R. at 44.)

---

[8] Trazodone is an antidepressant medication. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1744.

8

17. On July 17, 1998, after the hearing, but before the ALJ issued his decision, Plaintiff submitted medical records from the VA. (R. at 224.) A stress test on April 15, 1998 was terminated due to fatigue and chest pain without EKG changes. (R. at 231.) On May 27, 1998, Plaintiff's blood pressure was fairly well-controlled and further screening for a cause of his high blood pressure was contemplated. (R. at 227.) The ALJ issued his decision on December 1, 1998.

18. On November 10, 2000, Plaintiff, represented by Mr. Armstrong, submitted additional evidence to the Appeals Council. (R. at 239-292.) Plaintiff filed an application for Supplemental Security Income in January 2000, that was granted on June 21, 2000. (R. at 244-247.) On March 10, 1998, Rosemary Henrich, CFNP at the VA, evaluated Plaintiff. (R. at 290-292.) Plaintiff recounted that he had several chronic problems and that "frustration seem dangerous to him." (R. at 290.) He denied depression, but was concerned about his overall status. (*Id.*) Plaintiff had chest pains while playing basketball five months before and the clinic that evaluated him suggested that he might have angina. (*Id.*) Plaintiff reported heart disease, but no cancer or mental illness in his family. (*Id.*) Nurse Henrich opined that Plaintiff appeared to have many emotional issues that were preventing him from moving forward in life. (R. at 291.) On May 11, 1998, Nurse Henrich referred Plaintiff to Dr. Kapsner at the VA hypertension clinic and wondered if Plaintiff might have depression or insomnia. (R. at 289.)

19. Kathryn Blanke, Physician's Assistant at the VA, referred Plaintiff for a psychiatric evaluation on July 9, 1998, in part because his lawyer had requested additional profiling (R. at 274-275.) On July 20, 1998, PA Blanke wrote that Plaintiff's last episode of shooting chest pain was in August 1997, but that subsequently he had milder vague pains in the upper chest and left arm. (R. at 288.) On December 23, 1998, PA Blanke observed that Plaintiff had possible depression, multiple

9

somatic complaints, and difficulty sleeping despite the Trazodone. (R. at 287.)

20. On January 7, 1999, Mike Thornbrough, VA Staff Psychologist, evaluated Plaintiff. (R. at 276.) Plaintiff told Mr. Thornbrough that he could not hold a job, his sister was supporting him, that twenty years before during his divorce voices told him to cut off his penis, which he unsuccessfully attempted, and that he had fear of crowds, driving, and places where he had no control. (*Id*.) Mr. Thornbrough diagnosed panic disorder without agoraphobia and assigned Plaintiff a Global Functioning Assessment Scale (GAF) of 50.[9]

21. On January 29, 1999, Plaintiff presented to Maurice Rol, M.D., VA Staff Psychiatrist, with insomnia, anxiety and panic attacks. (R. at 285.) Plaintiff complained of physical symptoms of stress including muscle tension, stomach discomfort, palpitations, shortness of breath, feeling hot and flushed, difficulty concentrating, and feeling irritable. (R. at 285.) Dr. Rol noted that Plaintiff possibly heard voices and was hospitalized over twenty years before when he was going though a divorce. (*Id*.) Plaintiff reported no family history of mental illness. (*Id*.) Plaintiff's affect was anxious and irritable, his thought process was clear and goal oriented and his thought content tended towards worry. (*Id*.) Plaintiff had good abstracting ability, judgment and insight. (*Id*.) Dr. Rol diagnosed panic disorder with agoraphobia. (*Id*.)

22. On February 17, 1999, Dr. Kapsner wrote that Plaintiff did not wish to exercise because Plaintiff was convinced that since he had an enlarged heart, it would be bad for him. (R. at

---

[9]A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." *See* American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 1994) at 30. The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id*. at 32.

280.) Plaintiff was very anxious, his blood pressure was elevated, and having his blood pressure checked made him more anxious. (R. at 281.) On February 18, 1999, Plaintiff met with Kathleen Slattery, MSW, Social Worker with the VA. (R. at 282.) Ms. Slattery reported that Plaintiff described periods of intense panic manifesting as pains in his chest, tingling in the extremities, racing heartbeat, and stomach distress. (*Id*.) Plaintiff was convinced that he needed to stay away from stressful situations due to his heart condition. (*Id*.) Ms. Slattery diagnosed panic disorder and assessed Plaintiff's GAF at 45.

23. On February 19, 1999, Dr. Rol observed that Plaintiff was anxious, had catastrophic thought content, and investment in avoidance. (R. at 279.) Dr. Rol diagnosed panic disorder with agoraphobia and insomnia. (*Id*.) Dr. Rol prescribed a higher dose of Trazodone. (*Id*.) On February 23, 1999, Plaintiff attended a relaxation group, but he was unable to relax and the session actually increased his anxiety. (R. at 278.)

24. On February 22, 1999, Dr. Rol completed a Statement of Ability to Perform Work-Related Activities form. (R. at 249; 253.) Dr. Rol determined that Plaintiff's limitations in his abilities to maintain attention and concentration for extended periods, to work in coordination or proximity to others without being distracted by them, to complete a normal workday and workweek without interruption for psychologically based symptoms, to interact with the general public, and to accept instructions and respond appropriately to criticism from supervisors were severe enough to preclude any employment. (R. at 249-250.) Dr. Rol wrote that Plaintiff's problems were "more internal than external" and while Plaintiff did not "bother other people" he "internally experiences overwhelming anxiety with multiple physical symptoms that severely limit his functioning." (R. at 250.) On June 9, 2000, Dr. Rol wrote that Plaintiff had continuing high anxiety, multiple physical

11

symptoms, phobic avoidance, and significantly limited function.

25. On March 3, 2000, Gerald S. Fredman, M.D. performed a consultative psychiatric evaluation. (R. at 253-256.) Plaintiff reported significant problems with anxiety over the prior six years, including jumpiness, tension, excessive worry, problems falling and staying asleep, restlessness, fatigue, difficulty concentrating, irritability, and muscle tension. (R. at 253.) Dr. Fredman noted that Plaintiff had been undergoing psychiatric treatment with Dr. Rol at the VA, and had seen Dr. Rol three times since March 1999. (*Id.*) Plaintiff was taking Buspirone[10] and Trazodone in addition to his heart medications. (R. at 253; 254.) He noted that appetite was diminished, with no significant weight loss, energy level was poor and motivation was fair. (R. at 254.) Plaintiff had no friends, kept to himself, and liked to go to movies. (*Id.*) Plaintiff drank about two six packs of beer a week but reported no problems as a result of his drinking. (*Id.*) Plaintiff did not drive, but did some walking for exercise. (*Id.*)

26. Plaintiff had undergone mental health treatment in 1975 and 1976 in Puerto Rico for depression and anxiety when he was getting divorced. (R. at 254.) Plaintiff also saw a psychiatrist for an evaluation in 1991 when he was applying for welfare. (*Id.*) Plaintiff had a phobia of social situations and avoided social settings. (*Id.*) Plaintiff had no history of substance abuse or legal problems, but did have a family history of mental problems and his half-brother was institutionalized.[11] (*Id.*) Plaintiff had sustained a head injury with loss of consciousness at age twenty. (R. at 254.)

27. Plaintiff appeared to be of average intelligence, was cooperative, and appeared to be

---

[10] Buspirone is indicated for the management of anxiety disorders. PHYSICIAN'S DESK REFERENCE 820 (54th ed. 2000)

[11] This statement is inconsistent with what Plaintiff told Nurse Henrich on March 10, 1998. (R. at 290.)

a reliable historian. (R. at 255.) Mental status examination revealed orientation in three spheres and fair judgment. (*Id.*) Mood was not depressed and affect was appropriate. (*Id.*) Thoughts progressed in logical and coherent manner. (*Id.*) Plaintiff had tried to commit suicide in 1976 by cutting his penis with scissors. (*Id.*)

28. Dr. Fredman diagnosed generalized anxiety disorder and assigned Plaintiff a GAF of 46. (R. at 256.) Plaintiff's GAF score corresponded to serious impairment in social relations and occupational functioning. (*Id.*) Dr. Fredman's concluded that Plaintiff would have problems persisting at tasks of basic work, interacting with co-workers and of adapting to changes in the workplace due to his anxiety disorder. (*Id.*)

29. On March 2, 2001, Ken L. Williams, MA D-ABVE, LPCC, a vocational consultant and licensed mental health counselor, performed a disability evaluation at the request of Mr. Armstrong. (R. at 258.) Mr. Williams met with Plaintiff, administered vocations tests and reviewed Plaintiff's medical records. (R. at 258-262.) Mr. Williams concluded that Plaintiff had lost access to 100% of the labor market. (R. at 262.)

**Discussion**

30. Plaintiff contends that the ALJ failed to develop the record with respect to his mental impairment, the ALJ and the Appeals Council failed to properly consider the severity of his mental impairment, the ALJ failed to apply correct legal standard at step four, and the ALJ improperly assessed his credibility by failing to comply with SSR 96-7p.

31. While the record before the ALJ contained only limited evidence of a mental impairment, it did establish that Plaintiff had been prescribed Trazodone to control his anxiety, depression and sleep disturbances. (R. at 227.) Moreover, Plaintiff stated on his request for hearing

13

that he had anxiety and depression, and testified at length about how his anxiety affected his daily activities. (R. at 30; 36; 42; 44.) This evidence was sufficient to alert the ALJ that Plaintiff might be suffering from a severe mental impairment.

32. Although the claimant bears the burden of providing medical evidence proving disability, the ALJ has a basic duty of inquiry to fully and fairly develop the record. *Baca v. Dep't of Health & Human Servs.*, 5 F. 3d 476, 479-80 (10th Cir. 1993). The evidence indicating that Plaintiff had a mental problem triggered the ALJ's duty to develop the record in this regard. *Carter v. Chater*, 73 F. 3d 1019, 1021-1022 (10th Cir. 1996). The ALJ failed to fulfill satisfy this basic duty of inquiry. The ALJ should have ordered a consultative examination to assess the status of Plaintiff's mental condition and any effects on his ability to perform substantial gainful activity.

33. The ALJ has broad latitude in determining whether to order a consultative examination. *See Diaz v. Secretary of Health & Human Servs.*, 898 F. 2d 774, 778 (10th Cir. 1990). In deciding whether the ALJ erred in not ordering a consultation, the Court must consider whether there is sufficient medical evidence in the record so that the ALJ can make an informed decision without a consultative examination. *Matthews v. Bowen*, 879 F. 2d 422, 424 ( 8th Cir. 1989). In this situation there was scant evidence concerning the effect of the Plaintiff's mental condition on his ability to work. The ALJ could not have made an informed decision without a psychological consultation. Indeed, the consultative examination performed by Dr. Fredman in March 2000 confirmed the severity of Plaintiff's mental impairment and its impact on his ability to perform work related activities. A remand is required for the ALJ to consider the consultative report of Dr. Fredman.

34. Plaintiff submitted evidence of his mental condition to the Appeals Council after the

ALJ denied his claim. Pursuant to 20 C. F. R. § 404.970( b), the Appeals Council is required to consider evidence submitted with a request for review if the additional evidence is new, material, and relates to the period under review. *O'Dell v. Shalala*, 44 F. 3d 855, 858 (10th Cir. 1994). The evidence of Plaintiff's mental health treatment and the reports of Dr. Fredman and Mr. Williams are new, material, and relate to the period on or before the ALJ's decision. This evidence was considered by the Appeals Council, although the Appeals Council found that it provided no basis for changing the ALJ's decision. (R. at 5-6.) Accordingly, the additional materials submitted to the Appeals Council shall be considered along with the rest of the record in applying the substantial evidence standard. *O'Dell*, 44 F. 3d at 858.

35.     The Appeals Council affirmed the ALJ's finding of no severe mental impairment at step two. Step two requires only a *de minimis* showing by the claimant that he has an "impairment or combination of impairments which significantly limits his ability to do basic work activities." 20 C.F.R. §404.1520(c); *see Hawkins v. Chater*, 113 F. 3d 1162, 1169 (10th Cir. 1997). The evidence that was before the ALJ at the time of the hearing was sufficient to indicate the existence of a severe mental impairment. Combined with the additional evidence submitted to the Appeals Council, substantial evidence of record demonstrates that Plaintiff's mental impairment could significantly limit his ability to work. Plaintiff met his burden and the Commissioner erred in finding no severe mental impairment at step two. On remand, the ALJ should proceed with the sequential analysis with the finding that Plaintiff established a severe mental impairment step two.

36.     Plaintiff claims that the ALJ erred in determining that he could return to his past relevant work as a video store clerk. Step four of the sequential analysis is comprised of three phases. *Winfrey v. Chater*, 92 F. 3d 1017, 1023 (10th Cir. 1996). In the first phase, the ALJ must evaluate

a claimant's physical and mental residual functional capacity. *Id.* (*citing Henrie v. U. S. Dept. of Health & Human Servs.*, 13 F. 3d 359, 361 (10th Cir. 1993)). In the second phase, the ALJ must determine the physical and mental demands of the claimant's past relevant work. *Winfrey*, 92 F. 3d at 1023. In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. *Id*. The ALJ failed to apply the *Winfrey* analysis in his opinion. On remand, the ALJ should apply the *Winfrey* analysis.

37. Plaintiff asserts that the ALJ erred in assessing his credibility. "Credibility determinations are peculiarly the province of the finder of fact," and will not be overturned if supported by substantial evidence. *Kepler v. Chater*, 68 F. 3d 387, 391 (10th Cir. 1995); *see also Diaz v. Sec'y of Health and Human Servs.*, 898 F. 2d 774, 777 (10th Cir. 1990). However, "'[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" *McGoffin v. Barnhart*, 288 F. 3d 1248, 1254 (10th Cir. 2002)(*quoting Huston v. Bowen*, 838 F. 2d 1125, 1131 (10th Cir.1988)). While the record contains inconsistent statements that tend to undermine Plaintiff's credibility,[12] the ALJ found that Plaintiff was not credible based primarily on a lack of diagnosis and treatment of the mental disorder in the record before the ALJ. (R. at 13-14.) The record was not adequately developed when the ALJ assessed Plaintiff's credibility. On remand, the ALJ should reconsider his credibility determination in light of the entire record, including the materials submitted to the Appeals Council.

---

[12] Compare, for example, Plaintiff's statements to Dr. Fredman, (R. at 254), with Plaintiff's statements to Nurse Henrich. (R. at 290.)

## RECOMMENDED DISPOSITION

I recommend that Plaintiff's Motion to Reverse or Remand (Doc. 6), filed July 23, 2002, be **GRANTED** and that this matter be **REMANDED** to the Commissioner for the ALJ to obtain psychological consultative evaluation, to apply the analysis set forth in *Winfrey v. Chater*, 92 F. 3d 1017, 1023 (10th Cir. 1996), and to reconsider Plaintiff's credibility in light of the entire record, including the materials submitted to the Appeals Council.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may file with the Clerk of the District Court written objections to such proposed findings and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

```
_____
LESLIE C. SMITH
UNITED STATES MAGISTRATE JUDGE
```